**ENTERED**

NOV - 2 2011

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

**NOT FOR PUBLICATION**

**FILED**

NOV - 2 2011

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:4                Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re: | Case No. 2:08-bk-23318-PC |
| CENTURY CITY DOCTORS HOSPITAL, LLC, | Adversary No. 2:10-ap-02399-PC |
| Debtor. | Chapter 7 |
| RICHARD K. DIAMOND, CHAPTER 7 TRUSTEE, | **MEMORANDUM DECISION** |
| Plaintiff, | |
| v. | Date:  September 6, 2011 |
| | Time:  9:30 a.m. |
| LORRAINE P. AUERBACH, | Place:  United States Bankruptcy Court |
| | Courtroom # 1539 |
| | 255 East Temple Street |
| Defendant. | Los Angeles, CA 90012 |

Defendant, Lorraine P. Auerbach ("Auerbach") seeks a summary judgment against

Plaintiff, Richard K. Diamond, Chapter 7 Trustee ("Diamond") as to Diamond's First, Second,

Third, Fourth and Fifth Claims for Relief set forth in Diamond's First Amended Complaint to

Avoid and Recover Value of Fraudulent Transfers; Turnover; and Unjust Enrichment ("First

Amended Complaint").[1]  The court, having considered the pleadings, evidentiary record, and

arguments of counsel, makes the following findings of fact and conclusions of law pursuant to

---

[1] Diamond's Sixth Claim for Relief against Auerbach based on alleged unjust enrichment was
dismissed by Order Denying Plaintiff's Motion for Summary Judgment and Granting
Defendant's Motion for Summary Judgment on Plaintiff's Sixth Claim for Relief entered on July
21, 2011.

F.R.Civ.P. 52(a)(1),[2] as incorporated into FRBP 7052 and applied to adversary proceedings in bankruptcy cases.

## I. STATEMENT OF FACTS

On April 8, 2004, Auerbach executed a Consulting Agreement between Salas Surgical Group, LLC ("Salas"), as Client, and Auerbach and American Medical Systems, Inc. ("American"), jointly as Consultant, dated April 5, 2004.[3] Auerbach and American rendered consulting services pursuant to the contract as independent contractors for compensation of $22,917 per month in advance.[4] Century City Doctors Hospital, LP ("CCDH") was not a party to the Consulting Agreement. According to evidence submitted in support of Diamond's prior summary judgment motion, CCDH paid Auerbach $22,917 (Check No. 000619) on January 4, 2005.[5] On February 1, 2005, CCDH paid Auerbach $22,917 (Check No.000754).[6] On March 1, 2005, CCDH paid Auerbach $22,917 (Check No. 000916).[7] The three payments, collectively

---

[2] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

[3] See Declaration of Walter K. Oetzell in Support of Plaintiff's Notice of Motion and Motion for Summary Judgment Against Defendant Lorraine P. Auerbach on the Sixth Claim for Relief in Trustee's First Amended Complaint or, In the Alternative, for an Order Adjudicating Facts Existing Without Substantial Controversy ("Oetzell Decl. 1") Ex. 2.

[4] Id.

[5] Declaration of Howard B. Grobstein, CPA, CFE in Support of Plaintiff's Notice of Motion and Motion for Summary Judgment Against Defendant Lorraine P. Auerbach on the Sixth Claim for Relief in Trustee's First Amended Complaint or, In the Alternative, for an Order Adjudicating Facts Existing Without Substantial Controversy ("Grobstein Decl.") Ex. 6.

[6] Id. Ex. 7.

[7] Id. Ex. 8.

-2-

1   referred to as the "Consultant Payments," totaled $68,751.

2        Pursuant to a Management and Development Agreement ("MDA") dated August 6, 2004,

3   Salas provided certain management personnel and services to CCDH, including an "executive"

4   or "president."[8] On March 5, 2005, Salas employed Auerbach as President of CCDH on terms

5   consistent with the MDA pursuant to an Executive Employment Agreement signed by Auerbach,

6   Salus, and CCDH dated March 1, 2005.[9] In consideration for her services as President of CCDH,

7   the Executive Employment Agreement provided that Auerbach would receive "Compensation

8   and Benefits," including a salary from CCDH of $300,000 per year, annual bonus, insurance and

9   other benefits as set forth in the agreement.[10] Paragraph 2.4.6 of the Executive Employment

10  Agreement provided that Salas, as Employer, would provide Auerbach with a relocation loan of

11  $180,000 ("Relocation Loan") payable in 3 years.[11] On March 8, 2005, CCDH paid Auerbach

12  $180,000 (Check No. 01160).[12]

13       On August 22, 2008, CCDH filed a voluntary petition under chapter 7 of the Code and

14  Diamond was appointed as trustee. On July 30, 2010, Diamond commenced this adversary

15  proceeding against Auerbach. In his First Amended Complaint, Diamond states, in pertinent

16  part:

17       Plaintiff is informed and believes and, based thereon, alleges, that [CCDH] made
    transfers to [Auerbach] totaling no less than $257,178.76 including, but not limited to, the

18  transfers identified in Exhibit "1" . . . (individually and collectively, the "Subject
    Transfers").[13]

19

20  _____

21  [8] Deposition of Lorraine P. Auerbach ("Auerbach Depo.") Ex. 11 §§ 3.1-3.2.

22  [9] Oetzell Decl. 1 Ex. 4.

23  [10] Id. §§ 2.1-2.4.6; see also Auerbach Depo. Ex. 6 §§ 2.1-2.4.6.

24  [11] Id. § 2.4.6; see also Auerbach Depo. Ex. 6 § 2.4.6.

25  [12] Grobstein Decl. Ex. 9.

26
    [13] First Am. Compl. 2:22-25.
27

Exhibit "1" to Diamond's First Amended Complaint identifies Auerbach and lists the following

information:

| 619 | 01/04/05 | 01/13/05 | 22,917.00 | 22,917.00 |
|---|---|---|---|---|
| 754 | 02/01/05 | 02/17/05 | 22,917.00 | 22,917.00 |
| 916 | 03/01/05 | 03/11/05 | 22,917.00 | 22,917.00 |
| 1160 | 04/08/05 | 04/11/05 | 180,000.00 | 180,000.00 |
| 1322 | 06/03/05 | 06/15/05 | 2,073.94 | 2,073.94 |
| 1441 | 07/06/05 | 07/11/05 | 1,351.64 | 1,351.64 |
| 3033 | 06/22/06 | 06/26/06 | 5,002.18 | 5,002.18 |
| | | | 0.00 | 257,178.76[14] |

Diamond does not allege in his First Amended Complaint any other facts regarding the Subject

Transfers, but claims each of the Subject Transfers is avoidable for one or more of the following

reasons:

1.    CCDH allegedly "made the Subject Transfers [to Auerbach] with the actual intent to hinder, delay, or defraud one or more of its creditors."[15]

2.    CCDH allegedly "received less than reasonably equivalent value in exchange for such transfers or obligations," and "at the time the Subject Transfers were made, [CCDH] was either insolvent or became insolvent as a result of the Subject Transfers."[16]

3.    CCDH, at the time of the Subject Transfers, allegedly "was engaged, or was about to engage, in business or a transaction or transactions for which their remaining assets were unreasonably small capital."[17]

4.    CCDH allegedly "intended to incur, or believed or reasonably should have believed, that it would incur debts that would be beyond the ability to pay as such debts matured."[18]

Diamond also demands a turnover of the Subject Transfers, claiming an interest in each of them

---

[14] Id. Ex. 1.

[15] Id. 3:7-8 (First Claim for Relief).

[16] Id. 3:20-24 (Second Claim for Relief).

[17] Id. 4:9-10 (Third Claim for Relief).

[18] Id. 4:23-24 (Fourth Claim for Relief).

1  as property of the estate.[19]  Auerbach filed her answer to Diamond's First Amended Complaint

2  on January 28, 2011.  Discovery is complete.

3      On July 25, 2011, Auerbach moved for a summary judgment on Diamond's remaining

4  causes of action.  On August 16, 2011, Diamond filed his response in opposition to Auerbach's

5  motion and requested a summary judgment on each of his remaining claims against Auerbach

6  pursuant to F.R.Civ.P. 56(f)(1).  Auerbach filed her reply to Diamond's opposition on August 23,

7  2011.  After a hearing on September 6, 2011, the matter was taken under submission.[20]

8                                    II. DISCUSSION

9      This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

10  157(b) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (H)

11  and (O).  Venue is appropriate in this court.  28 U.S.C. § 1409(a).

12  A.  Summary Judgment.

13      Rule 56(a) authorizes a party to "move for summary judgment, identifying each claim or

14  defense – or the part of each claim or defense – on which summary judgment is sought."

15  F.R.Civ.P. 56(a).  Summary judgment must be granted "if the movant shows that there is no

16  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

17  Id.  In determining whether a genuine factual issue exists, "a trial judge must bear in mind the

18  actual quantum and quality of proof necessary to support liability . . . ."  Anderson v. Liberty

19  Lobby, Inc., 477 U.S. 242, 254 (1986).  "[T]he judge's function is not himself to weigh the

20

21  [19] Id. 5:8-11 (Fifth Claim for Relief).

22  [20] Trustee's Evidentiary Objections to Defendant Lorraine P. Auerbach's Declaration in Support
    of Motion for Summary Judgment are overruled.  The court takes judicial notice of Exhibits 1-18
23  attached to Plaintiff's 1st Set of Request for Judicial Notice in Support of Plaintiff's Opposition
    to Defendant's Notice of Motion and Motion for Summary Judgment [Set One] and Exhibit 20
24  attached to Plaintiff's 2nd Set of Request for Judicial Notice in Support of Plaintiff's Opposition
    to Defendant's Notice of Motion and Motion for Summary Judgment [Set Two] pursuant to
25  F.R.Evid. 201.  The court declines to consider the contents of any particular document that is the
    subject of judicial notice under F.R.Evid. 201 for the truth of the matter asserted absent an
26  applicable exception to the hearsay rule.

27                                      - 5 -

1   evidence and determine the truth of the matter but to determine whether there is a genuine issue

2   for trial . . . . If the evidence is merely colorable, . . . or is not significantly probative, . . .

3   summary judgment may be granted." Id. at 249–50.  However, the court's function on a motion

4   for summary judgment is "issue-finding, not issue-resolution." United States v. One Tintoretto

5   Painting Entitled "The Holy Catholic Family With Saint Catherine and Honored Donor, 691 F.2d

6   603, 606 (2d Cir. 1982).  Rule 56 does not permit "trial on affidavits.  Credibility determinations,

7   the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact

8   finder] functions . . . ." Anderson, 477 U.S. at 255.

9            Rule 56(c), which identifies the procedures the court and parties must follow in

10  conjunction with motions for summary judgment, states:

11           (1) **Supporting Factual Positions**.  A party asserting that a fact cannot be or is genuinely
             disputed must support the assertion by:

12

                  (A) citing to particular parts of materials in the record, including depositions,
13                documents, electronically stored information, affidavits or declarations,
                  stipulations (including those made for purposes of the motion only), admissions,
14                interrogatory answers, or other materials; or

15                (B) showing that the materials cited do not establish the absence or presence of a
                  genuine dispute, or that an adverse party cannot produce admissible evidence to
16                support the fact.

17           (2) **Objection That a Fact Is Not Supported by Admissible Evidence**.  A party may
             object that the material cited to support or dispute a fact cannot be presented in a form
18           that would be admissible in evidence.

19           (3) **Materials Not Cited**.  The court need consider only the cited materials, but it may
             consider other materials in the record.

20
             (4) **Affidavits or Declarations**.  An affidavit or declaration used to support or oppose a
21           motion must be made on personal knowledge, set out facts that would be admissible in
             evidence, and show that the affiant or declarant is competent to testify on the matters
22           stated.

23  F.R.Civ.P. 56(c)   The court may grant summary judgment "[i]f a party fails to properly support

24  an assertion of fact or fails to properly address another party's assertion of fact as required by

25  Rule 56(c)." See F.R.Civ.P. 56(e)(3).

26           When the nonmoving party has the burden of proof at trial, the moving party need only

27

                                          - 6 -

1  point out "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>

2  <u>Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986); <u>see</u> <u>Fairbank v. Wunderman Cato Johnson</u>, 212 F.3d

3  528, 532 (9th Cir. 2000) (stating that the <u>Celotex</u> showing can be made by "pointing out through

4  argument-the absence of evidence to support plaintiff's claim"). "Once the moving party carries

5  its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the

6  adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth

7  specific facts showing that there is a genuine issue for trial.' " <u>Devereaux v. Abbey</u>, 263 F.3d

8  1070, 1076 (9th Cir. 2001) (quoting former F.R.Civ.P. 56(e)); <u>see</u> <u>Celotex</u>, 477 U.S. at 323-24.

9  If the nonmoving party fails to establish a triable issue "on an essential element of her case with

10  respect to which she has the burden of proof," the moving party is entitled to judgment as a

11  matter of law. <u>Celotex</u>, 477 U.S. at 323.

12  B. <u>Contentions of the Parties</u>.

13      Auerbach contends that she is entitled to summary judgment as a matter of law on all of

14  Diamond's remaining claims and, as grounds therefor, points to two uncontroverted material

15  facts:

16      First, "[t]here is no evidence that CCDH made [the Subject Transfers] with the actual
       intent to hinder, delay, or defraud its creditors."[21]

17
       Second, "[u]nder the totality of circumstances, [CCDH] received reasonably equivalent
18     value in exchange for the transfers made to [Auerbach]."[22]

19

20

21
   _____

22  [21] Defendant's Notice of Motion and Motion for Summary Judgment; Memorandum of Points
    and Authorities ("Auerbach Mot.") 4:9-10.  <u>See</u> Auerbach's Statement of Uncontroverted Facts

23  and Conclusions of Law in Support of Defendant's Motion for Summary Judgment ("Auerbach's
    Uncontroverted Facts") 2:9-13.

24
    [22] Auerbach's Uncontroverted Facts 2:3-6. In her motion, Auerbach notes that she "is not

25  moving for summary judgment on the element of insolvency at this time," and that she "reserves
    [her] right to do so at a later time and/or contest [Diamond's] claim of insolvency at trial."

26  Auerbach Mot. 3:27-28, n. 4.

27
                                        - 7 -

1   Diamond disagrees, arguing that each of Subject Transfers[23] was either actually or constructively

2   fraudulent because (1) Auerbach was paid the Consultant Payments by CCDH when Salas, not

3   CCDH, was required to make such payments to Auerbach under the specific terms of the

4   Consultant Agreement; (2) Auerbach received the Relocation Loan from CCDH when Salas, not

5   CCDH, was required to fund the Relocation Loan under the express terms of the Executive

6   Employment Agreement; and (3) there is evidence of at least 7 badges of fraud underlying the

7   facts and circumstances of the Subject Transfers.  Diamond further argues that the Subject

8   Transfers cannot be considered "salary" or "wages" because Auerbach received compensation

9   from CCDH for her services as President of CCDH and was "paid in full for her services."[24]

10  According to Diamond, Auerbach's attempt to characterize the transfers as an exchange for

11  services is disingenuous and contradicts the express terms of her Consulting Agreement and

12  Executive Employment Agreement.

13  C. Parol Evidence Rule.

14      Before considering the summary judgment evidence, the court must address the parol

15  evidence rule discussed at length by the parties.[25]  Auerbach argues that the Consultant Payments

16  and Relocation Loan constituted an integral part of her compensation package as President of

17  CCDH; therefore, payment of the Subject Transfers by CCDH, rather than Salas, was not only

18  required by California law, but within the contemplation of the parties at the time the Consultant

19  Agreement and Executive Employment Agreement were executed.  Specifically, Auerbach

20

---

21  [23] Notwithstanding the allegations in the First Amended Complaint, the Subject Transfers,
22  according to Diamond's opposition, are now limited to the Consultant Payments and Relocation
    Loan.  Plaintiff's Opposition to Defendant's Notice of Motion and Motion for Summary
23  Judgment; Memorandum of Points and Authorities ("Diamond Opp'n") 6:1-7.

24  [24] Diamond Opp'n 6:14.

25  [25] The parol evidence rule "is not a rule of evidence but is one of substantive law."  Casa
26  Herrera, Inc. v. Beydoun, 32 Cal.4th 336, 343 (2004) (quoting Estate of Gaines, 15 Cal.2d 255,
    264 (1940) (emphasis in original)).
27

- 8 -

1  asserts:

2      First, there is nothing in the employment agreements that prohibited Mrs. Auerbach from
       accepting compensation and benefits from CCDH.
3
       Second, since CCDH is not a party to the employment agreements, it never agreed that it
4      would not pay Mrs. Auerbach her wages and benefits, and Mrs. Auerbach never agreed in
       the employment agreements with her employer, CCDH, that she wouldn't accept payments
5      by CCDH.

6      Third, the employment agreements do not constitute a release of CCDH's obligation to
       pay its employee. Indeed, as a matter of California labor law, CCDH had an independent,
7      joint obligation to pay Mrs. Auerbach regardless of Salas's separate promise to pay. Not
       surprisingly, the facts show that CCDH acknowledged its responsibility and paid Mrs.
8      Auerbach. This is entirely logical since Mrs. Auerbach worked exclusively for CCDH, a
       limited partnership. She did not work for or provide direct benefits to Salas, the general
9      partner of CCDH.

10     Fourth, although Mrs. Auerbach's receipt of the payments does not conflict with the
       language of the employment agreements that were not signed by CCDH, her testimony is
11     not barred by the Parol Evidence Rule, particularly when asserted by CCDH, a stranger to
       the employment agreements.[26]
12
   Diamond, on the other hand, argues that the language of both the Consultant Agreement and
13

14  ─────────────────────────────

15  [26] Auerbach Mot. 12:1-15. California has abolished the so-called "Stranger Rule" as an
    exception to the parol evidence rule. See Neverkovec v. Fredericks, 74 Cal.App.4th 337 (1999).
16  In Neverkovec, the court stated:

17      Before 1979, the parol evidence rule did not apply in an action between a contracting
        party and a stranger to the contract. The Legislature abolished this limitation in 1978
18      by revising section 1856.

19  Neverkovec, 74 Cal.App.4th at 350, n. 8 (emphasis added). In an earlier case, the court in Kern
20  County Water Agency v. Belridge Water Storage Dist., 18 Cal.App.4th 77 (1993) adopted the
    view that the amendment of Cal. Code Civ. Proc. § 1856 abrogated the "Stranger Rule," stating:
21
22      Prior to 1978, Code of Civil Procedure section 1856 included language which limited
        application of the parol evidence rule to parties, their representatives, and/or
23      successors in interest. Case law interpreted this language as making the parol
        evidence rule inapplicable in actions involving a stranger to the contract . . . . In
24      1978, the statute was substantially amended by, among other changes, deleting the
        limitation language.
25

26  Id. at 86 (emphasis added). Accordingly, Auerbach's statement that the "Stranger Rule" is an
    applicable exception to the parol evidence rule is incorrect.
27

- 9 -

1    Executive Employment Agreement is clear and unambiguous.  Diamond points to the integration

2    clauses contained in each agreement, and asserts that the court is prohibited from considering any

3    extrinsic evidence, including Auerbach's declaration, to interpret, vary or add to their

4    unambiguous terms.[27]

5        In California, the parol evidence rule is codified in Section 1625 of the California Civil

6    Code[28] and Section 1856 of the California Code of Civil Procedure.[29]  It "generally prohibits the

7

8    [27] Diamond Opp'n 7:8-12; 8:11-9:5.

9    [28] Section 1625 of the California Civil Code states:

10

11        The execution of a contract in writing, whether the law requires it to be written or not,
        supersedes all the negotiations or stipulations concerning its matter which preceded or
12        accompanied the execution of the instrument.

13    Cal. Civ. Code § 1625.

14    [29] Section 1856 of the California Code of Civil Procedure states:

15        (a) Terms set forth in a writing intended by the parties as a final expression of their
        agreement with respect to such terms as are included therein may not be contradicted by
16        evidence of any prior agreement or of a contemporaneous oral agreement.

17
        (b) The terms set forth in a writing described in subdivision (a) may be explained or
18        supplemented by evidence of consistent additional terms unless the writing is intended
        also as a complete and exclusive statement of the terms of the agreement.
19
20        (c) The terms set forth in a writing described in subdivision (a) may be explained or
        supplemented by course of dealing or usage of trade or by course of performance.
21
22        (d) The court shall determine whether the writing is intended by the parties as a final
        expression of their agreement with respect to such terms as are included therein and
23        whether the writing is intended also as a complete and exclusive statement of the terms of
        the agreement.
24
25        (e) Where a mistake or imperfection of the writing is put in issue by the pleadings, this
        section does not exclude evidence relevant to that issue.
26
        (f) Where the validity of the agreement is the fact in dispute, this section does not exclude
27

1  introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of

2  an integrated written instrument." Alling v. Universal Mfg. Corp., 5 Cal.App.4th 1412, 1433

3  (1992). When applying the parol evidence rule, the court must ask two questions: (1) whether the

4  writing was intended to be an integration; and (2) whether the writing is susceptible of the

5  meaning contended for by the party offering the evidence. See Brinderson-Newberg Joint Venture

6  v. Pacific Erectors, Inc., 971 F.2d 272, 276-7 (9th Cir. 1992) (citations omitted).

7        With regard to the first inquiry, the Consulting Agreement and the Executive Employment

8  Agreement are each completely integrated agreements. Therefore, parol evidence of terms not

9  specifically included in the Consulting Agreement or Executive Employment Agreement is not

10  admissible by the parties thereto to vary, alter or add to the terms of either agreement. However,

11  the existence of an integration clause does not, of and by itself, exclude parol evidence "of the

12  circumstances under which the agreement was made or to which it relates, as defined in Section

13  1860, or to . . . otherwise interpret the terms of the agreement . . . ." Cal. Code Civ. Proc. §

14  1856(g); see Neverkovec, 74 Cal.App.4th at 350 ("the statute 'does not exclude other evidence of

15

16  _____

17        evidence relevant to that issue.

18        (g) This section does not exclude other evidence of the circumstances under which the
       agreement was made or to which it relates, as defined in Section 1860, or to explain an
19       extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish
       illegality or fraud.

20
       (h) As used in this section, the term agreement includes deeds and wills, as well as
21       contracts between parties.

22  Cal. Code Civ. Proc. § 1856. Section 1860 further provides:

23
       For the proper construction of an instrument, the circumstances under which it was made,
24       including the situation of the subject of the instrument, and of the parties to it, may also
       be shown, so that the Judge be placed in the position of those whose language he is to
25       interpret.

26
   Cal. Code Civ. Proc. § 1860.
27
                                    - 11 -

1  the circumstances under which the agreement was made or to which it relates, as defined in

2  Section 1860, or to . . . otherwise interpret the terms of the agreement' ") (citations omitted).  As

3  the court observed in <u>Pac. Gas & Elec. Co. v. G.W. Thomas Draying & Rigging Co.</u>, 69 Cal.2d 33

4  (1968):

5      [T]he meaning of a writing '. . . can only be found by interpretation in the light of all the
    circumstances that reveal the sense in which the writer used the words.  The exclusion of
6      parol evidence regarding such circumstances merely because the words do not appear
    ambiguous to the reader can easily lead to the attribution to a written instrument of a
7      meaning that was never intended.

8      Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of
    a written contract, these terms must first be determined before it can be decided whether or
9      not extrinsic evidence is being offered for a prohibited purpose.  The fact that the terms of
    an instrument appear clear to a judge does not preclude the possibility that the parties
10     chose the language of the instrument to express different terms.  That possibility is not
    limited to contracts whose terms have acquired a particular meaning by trade usage, but
11     exists whenever the parties' understanding of the words used may have differed from the
    judge's understanding.

12 <u>Id.</u> at 38-39 (citations omitted).  Parol evidence is therefore admissible under the second inquiry if

13 the written contract is susceptible of the meaning contended for by the party offering the evidence.

14 <u>Brinderson-Newberg Joint Venture</u>, 971 F.2d at 277.  "Even if the written agreement is clear and

15 unambiguous on its face, the trial court must receive relevant extrinsic evidence that can prove a

16 meaning to which the language of the contract is 'reasonably susceptible.' " <u>Brobeck, Phleger &</u>

17 <u>Harrison v. Telex Corp.</u>, 602 F.2d 866, 871 (9th Cir.), <u>cert denied</u>, 444 U.S. 981 (1979) (quoting

18 <u>Pac. Gas & Elec. Co.</u>, 69 Cal.2d at 37).  "To avoid completely eviscerating the parol evidence

19 rule, . . . there must be reasonable harmony between the parol evidence and the integrated contract

20 for the evidence to be admissible." <u>Brinderson-Newberg Joint Venture</u>, 971 F.2d at 277.  "If the

21 court finds after considering this preliminary evidence that the language of the contract is not

22 reasonably susceptible of [the proffered] interpretation and is unambiguous, extrinsic evidence

23 cannot be received for the purpose of varying the terms of the contract." <u>Brobeck, Phleger &</u>

24 <u>Harrison</u>, 602 F.2d at 871

25     There is no conflict between the parol evidence rule and the necessity to consult extrinsic

26 evidence under the circumstances of this case.  First, this is not a breach of contract action.

27

- 12 -

1 | CCDH was not a party to the Consulting Agreement or the Executive Employment Agreement.[30]

2 | Nor is the court "interpreting" the agreements to determine the respective rights and liabilities of

3 | the parties thereto, i.e., Salas and Auerbach. Diamond is seeking to recover certain transfers from

4 | Auerbach claimed to be fraudulent. Extrinsic evidence is not offered by Auerbach to vary, alter or

5 | add to the obligations of Salas under either agreement, but to show that CCDH, as Auerbach's

6 | employer, had an independent obligation to make the Subject Transfers given the nature of

7 | Auerbach's compensation package as President of the hospital. Under the circumstances, the

8 | proffered evidence is relevant and admissible to prove a meaning to which the language of each

9 | contract is reasonably susceptible. Second, Auerbach was employed pursuant to the Executive

10 | Employment Agreement as President of CCDH. In that capacity, Auerbach served CCDH for 2 ½

11 | years and rendered valuable services to CCDH. Parol evidence is admissible to establish the

12 | actual consideration for a contract, even if such evidence directly conflicts with an express recital

13 | in a written agreement. Feinberg v. Teitelbaum Furs, Inc., 236 Cal.App.2d 744, 751 (1965).

14 | Parol evidence is also admissible on the issue of whether CCDH and Salus were the joint

15 | employers of Auerbach. Finally, there is nothing in the Consulting Agreement or the Executive

16 | Employment Agreement, as Auerbach points out, that prohibited Auerbach from accepting

17 | compensation and benefits from CCDH as President of the hospital.

18 | D. CCDH and Salus Were Joint Employers of Auerbach.

19 |      In his opposition, Diamond did not confront the issue of whether CCDH and Salas were

20 | joint employers of Auerbach. "Joint employment occurs when 'two or more persons engage the

21 | services of an employee in an enterprise in which the employee is subject to the control of both.' "

22 | Ankeny v. Meyer (In re Ankeny), 184 B.R. 64, 73 (9th Cir. BAP 1995) (quoting In-Home

23 | Supportive Servs. v. Workers' Comp. Appeals Bd., 152 Cal.App.3d 720, 732 (1984)). Generally,

24 |

25 | [19] CCDH signed the Executive Employment Agreement, but CCDH's execution of the agreement was limited to an acknowledgment that it had agreed to loan Auerbach an amount

26 | sufficient to purchase 6.667 units of limited partnership interests in CCDH as "an additional incentive" to her employment as President of CCDH. Oetzell Decl. 1 Ex. 4 § 2.4.2.

27 |

- 13 -

1  "an employer is one who has control and direction over the employee in regard to services

2  performed." Ankeny, 184 B.R. at 72. In addition to "control and direction," the following four

3  factors are relevant in determining whether the "economic realities" of the relationship support a

4  finding of joint employment: "(1) the power to discharge the employee; (2) the payment of salary;

5  (3) the nature of the services; and (4) the parties' belief as to the existence of an employment

6  relationship." Id.

7       According to Auerbach's summary judgment evidence, Auerbach was employed as

8  President of CCDH and served as President of CCDH from March 5, 2005 to October 4, 2006.

9  She was hired by Salus,[31] the managing general partner of CCDH, and ultimately fired by Salus

10 without cause.[32] Auerbach testified by declaration that:

11      Commencing in March 2004, I agreed to accept the CCDH President position and work
        exclusively for CCDH, taking no other positions.

12
        Although the consulting contract denominated me as a consultant, I never did any of my
13      work under the label of consultant. I did all my work as the appointed President of
        CCDH.[33]

14
        I was required to report to CCDH's Chief Executive Officer and to the CCDH Board of
15      Directors. I had no reporting responsibility to Salus Surgical Group and I did not work for
        Salus Surgical Group.

16
        I was directly employed, paid by and received benefits as an employee of CCDH.

17
        In March 2004 and for approximately the next 6 months, I worked primarily with Mark
18      Bidner, President of the CCDH Managing General Partner, Joel Bergenfeld and also
        Randy Rosen, CEO of the CCDH Managing General Partner in my capacity as President.[34]

19
        I was listed on CCDH's list of employees.

20
        I was assigned an employee number by CCDH, # 10064, just like other CCDH employees.

21

22  _____

23  [31] See supra note 9.

24  [32] Declaration of Lorraine P. Auerbach in Support of Defendant's Opposition to Plaintiff's
    Motion for Summary Judgment ("Auerbach Decl.") Ex. 9.

25
    [33] Id. ¶ 12.
26
    [34] Id. ¶ 13.
27
                                          - 14 -

1   My employee # appears on many CCDH business records that are attached to my
    declaration as exhibits.

2   I received W-2 statements from CCDH.

3   I was enrolled in CCDH's group insurance plan, which was only open to employees of
4   CCDH.

5   I signed up for all CCDH employee benefits that were offered only to employees of
    CCDH, including Unum life insurance, Blue Shield health insurance, ExecuCare health
6   insurance, Met Life disability coverage, VPN vision and Delta dental; 401k plan[.] All of
    these policies and benefits applied only to CCDH employees.  Salus Surgical Group had
7   different benefits plans, but because I was not an employee of Salus Surgical Group I did
    not participate in any employee benefits for Salus Surgical Group.

8   I participated in the CCDH executive benefits plan.  This program applied only to
9   executives of CCDH.  Salus executives did not participate and were not eligible.  Salas
    executives had a completely different and separate plans.  My performance was always
10  evaluated by the Hospital's Board of Directors.[35]

11  As President of CCDH, Auerbach worked "a 12- to 14-hour day, and 24-hour responsibility on

12  call."[36]  She directly supervised "a dozen" departments.[37]  Auerbach understood that she was

13  employed by CCDH, not Salus.[38]  She rendered services for the benefit of CCDH, not Salus.[39]

14  She testified that there was never a time when CCDH failed to pay her for her compensation as

15  President of CCDH nor were any of her payroll checks from CCDH returned for insufficient

16  funds.[40]  Diamond did not offer any evidence to the contrary.

17      CCDH and Salas were joint employers of Auerbach.  Auerbach served as President of

18  CCDH.  CCDH paid Auerbach's salary, bonus and benefits.  Auerbach believed she was an

19  employee of CCDH, and CCDH was, in fact, her employer.  CCDH provided the method and

20  _____

21  [35] Auerbach Decl. ¶ 14.

22  [36] Auerbach Depo. 75:9-10.

23  [37] Id. 75:22-24.

24  [38] Id. 37:16-18.

25  [39] Auerbach Decl. ¶ 36-¶ 45.

26  [40] Auerbach Depo. 39:15-21.

27                                    - 15 -

1   means for her work as president of the hospital. CCDH's CEO, Joel Bergenfeld, provided direct

2   supervision of Auerbach and controlled the scope and everyday aspects of her employment at

3   CCDH.

4   E.  Auerbach is Entitled to Summary Judgment Dismissing Diamond's Fraudulent Transfer
Claims Under § 548.

5

6        Section 548(a)(1) of the Code states, in pertinent part:

7        The trustee may avoid any transfer (including any transfer to or for the benefit of an insider
under an employment contract) of an interest of the debtor in property, or any obligation
incurred by the debtor, that was made or incurred on or within 2 years before the date of

8        the filing of the petition, if the debtor voluntarily or involuntarily –

9           (A) made such transfer or incurred such obligation with the actual intent to hinder,
delay, or defraud any entity to which the debtor was or became, on or after the date

10          that such transfer was made or such obligation was incurred, indebted; or

11           (B)(i) received less than a reasonably equivalent value in exchange for such
transfer or obligation; and

12

13          (ii)(I) was insolvent on the date that such transfer was made or such obligation was
incurred, or became insolvent as a result of such transfer or obligation;

14           (II) was engaged in business or a transaction, or was about to engage in business or
a transaction, for which any property remaining with the debtor was an

15          unreasonably small capital;

16           (III) intended to incur, or believed that the debtor would incur, debts that would be
beyond the debtor's ability to pay as such debts matured; or

17

18           (IV) made such transfer to or for the benefit of an insider, or incurred such
obligation to or for the benefit of an insider, under an employment contract and not
in the ordinary course of business.

19

20   11 U.S.C. § 548(a)(1).

21        Diamond's First Amended Complaint asserts claims under both §§ 544 and 548. In her

22   motion, Auerbach states: "Plaintiff has conflated the federal fraudulent transfer claims and state

23   law fraudulent transfer claims in each of the fraudulent conveyance claims."[41] In response,

24   Diamond does not address his claims under § 548, but refers almost exclusively to his claims

25   under § 544(b) and California Civil Code § 3439, et seq. CCDH filed its voluntary petition on

26

27   [41] Auerbach Mot. 2:8-9.

1   August 22, 2008.  It is undisputed that each of the Subject Transfers occurred in 2005.  Because

2   the Subject Transfers were not made or incurred within 2 years before the date of the filing of the

3   petition, Auerbach is entitled to a summary judgment dismissing Diamond's claims to avoid the

4   subject transfers as fraudulent under § 548.  See 11 U.S.C. § 548 (a)(1).

5   F.  Auerbach is Entitled to Summary Judgment Dismissing Diamond's Turnover Claim.

6           Section 542(a) of the Code requires "an entity, other than a custodian, in possession,

7   custody, or control, during the case, of property that the trustee may use, sell, or lease under

8   section 363 . . . , [to] deliver to the trustee, and account for, such property or the value of such

9   property, unless such property is of inconsequential value or benefit to the estate."  11 U.S.C. §

10  542(a).  At footnote 2 of the motion, Auerbach states:

11          Plaintiff's Fifth Claim for Relief is a turnover request.  There is no factual or legal basis for
            such a request.  Further, Defendant submits that this claim cannot stand because the Court
            has already dismissed the unjust enrichment (restitution) claim, which subsumed any
12          request for turnover.[42]

13  The Subject Transfers are not property subject to a turnover under § 542(a), but must be avoided

14  by Diamond using one or more of his avoidance powers as trustee under § 544, et seq. and

15  recovered under § 550.  Section 550 governs whether, and to what extent, an avoidable transfer

16  can be recovered from a particular party.  Harrison v. Brent Towing Co., Inc. (In re H & S Transp.

17  Co., Inc.), 939 F.2d 355, 359 (6th Cir. 1991) (transaction must first be avoided as a preference or

18  fraudulent transfer before actual recovery may be had under § 550).  Accordingly, Auerbach is

19  entitled to a summary judgment dismissing Diamond's claim for turnover under § 542(a). See 11

20  U.S.C. § 542 (a).

21  G.  Auerbach is Entitled to Summary Judgment Dismissing Diamond's First, Second, Third and
    Fourth Claims for Relief Under § 544.

22

23          Section 544(b)(1) states, in pertinent part:

24          [T]he trustee may avoid any transfer of an interest of the debtor in property . . . that is
            voidable under applicable law by a creditor holding an unsecured claim that is allowable
25

26  _____

    [42] Id. 2:n. 2.
27

                                    - 17 -

1    under section 502 . . . or that is not allowable only under section 502(e) . . . .

2    11 U.S.C. § 544(b)(1).  In other words, a trustee may avoid transfers or obligations that could

3    have been avoided by an unsecured creditor under applicable non-bankruptcy law had the

4    bankruptcy case not been filed, provided such a creditor actually exists.  Diamond seeks to avoid

5    the Subject Transfers under § 544(b) as having been made by CCDH with the actual intent to

6    hinder, delay or defraud a creditor in violation of California's Uniform Fraudulent Transfer Act

7    ("UFTA"), which states:

8        (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
         whether the creditor's claim arose before or after the transfer was made or the obligation
9        was incurred, if the debtor made the transfer or incurred the obligation as follows:

10           (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

11           (2) Without receiving a reasonably equivalent value in exchange for the transfer or
             obligation, and the debtor either:

12
                (A) Was engaged or was about to engage in a business or transaction for
13              which the remaining assets of the debtor were unreasonably small in
                relation to the business or transaction.
14
                (B) Intended to incur, or believed or reasonably should have believed that
15              he or she would incur, debts beyond his or her ability to pay as they became
                due.
16
     Cal. Civ. Code § 3439.04(a).  To prevail in a fraudulent transfer action under California's UFTA,
17
     Diamond must establish by a preponderance of the evidence that CCDH made the Subject
18
     Transfers to Auerbach with the actual intent to hinder, delay or defraud a creditor.  See Wolkowitz
19
     v. Beverly (In re Beverly), 374 B.R. 221, 235 (9th Cir. BAP 2007) ("Whether there is actual intent
20
     to hinder, delay, or defraud under UFTA is a question of fact to be determined by a preponderance
21
     of evidence.").  Because a debtor rarely admits to such a transfer, the evidence of intent "must of
22
     necessity consist of inferences drawn from the circumstances surrounding the transaction and the
23
     relationship and interests of the parties." Neumeyer v. Crown Funding Corp., 56 Cal.App.3d 178,
24
     183 (1976); see Beverly, 374 B.R. at 235 ("Since direct evidence of intent to hinder, delay or
25
     defraud is uncommon, the determination typically is made inferentially from circumstances
26
     consistent with the requisite intent.").  The UFTA identifies 11 non-exclusive factors, or "badges
27
     - 18 -

1  of fraud," that may be applied by a court to divine fraudulent intent:

2      1.    Whether the transfer or obligation was to an insider.

3      2.    Whether the debtor retained possession or control of the property transferred after the transfer.

4

5      3.    Whether the transfer or obligation was disclosed or concealed.

6      4.    Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

7      5.    Whether the transfer was of substantially all the debtor's assets.

8      6.    Whether the debtor absconded.

9      7.    Whether the debtor removed or concealed assets.

10      8.    Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

11

12      9.    Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

13

14      10.    Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

15      11.    Whether the debtor transferred essential assets of the business to a lienholder who then transferred the assets to an insider of the debtor.

16  Cal. Civ. Code § 3439.04(b). The UFTA factors are intended "to provide guidance to the trial

17  court, not compel a finding one way or another." Filip v. Bucurenciu, 129 Cal.App.4th 825, 834

18  (2005). As the court observed in Beverly:

19

20      The UFTA list of "badges of fraud" provides neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the case, even if no "badges of fraud" are present. Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of "badges of fraud."

21

22  374 B.R. at 236. Indeed, the existence of even several "badges of fraud" may be insufficient to

23  create an inference of fraudulent intent sufficient to defeat summary judgment. Annod Corp. v.

24  Hamilton & Samuels, 100 Cal.App.4th 1286, 1298 (2002).

25      The debtor's state of mind is "the focus in the inquiry into actual intent." Plotkin v.

26  Pomona Valley Imports, Inc. (In re Cohen), 199 B.R. 709, 717 (9th Cir. BAP 1996); see Beverly,

27

- 19 -

1  374 B.R. at 235 ("The focus is on the intent of the transferor."). "[T]he adequacy or equivalence

2  of consideration provided for the actually fraudulent transfer is not material to the question [of]

3  whether the transfer is actually fraudulent." <u>Cohen</u>, 199 B.R. at 717; <u>see</u> <u>Beverly</u>, 374 B.R. at 235

4  ("Any of the three – intent to hinder, intent to delay, or intent to defraud – qualifies the transfer for

5  UFTA avoidance . . . ."). A transferee may be entitled to keep the transfer if she can show that she

6  is "a person who took in <u>good faith and for a reasonably equivalent value</u>." Cal. Civ. Code §

7  3439.08 (emphasis added). "Conversely, the transferor's intent is immaterial to the constructively

8  fraudulent transfer in which the issue is equivalence of the consideration coupled with either

9  insolvency, or inadequacy of remaining capital, or inability to pay debts as they mature." <u>Cohen</u>,

10  199 B.R. at 717.

11          Auerbach maintains there is no evidence of actual intent to hinder, delay, or defraud any

12  creditor of the debtor. According to Auerbach, "the proposition that the newly formed CCDH

13  partnership paid its President three monthly payments as an act in fraud on creditors, before the

14  doors to the hospital were opened for patients, is preposterous."[43]  With respect to the Consultant

15  Payments totaling $68,751, Auerbach states:

16          Plaintiff's evidence shows that the payments made to Mrs. Auerbach were deliberate, not
            the product of any mistake, and were part of CCDH's ordinary financial affairs. The
17          Declaration of Howard B. Grobstein identifies the three checks written to Lorraine P.
            Auerbach in the amount of $22,917.00 each (Exhibits 6-8). Each of the checks is
18          accompanied by a "Century City Doctors Hospital Request For Check" designating
            Lorraine Auerbach as the payee, and stating "Purpose: Consulting - President CCDH."
19          Hence, the evidence by Plaintiff and by Mrs. Auerbach (Auerbach Declaration paras. 31-
            34) plainly show[s] that the payments were deliberate, not the product of any mistake, and
20          were routine.[44]

21  With respect to the Relocation Loan of $180,000, Auerbach asserts:

22          The same applies to the April 2005, $180,000 relocation payment that is signed by Randy
            Rosen and was delivered to Mrs. Auerbach in response to her direct discussion and
23          understanding with Mark Bidner. (Auerbach Declaration para. 35) Even the evidence put
            forth by the Plaintiff shows the nature of the reasonable equivalent exchange and routine
24

25  _____

26  [43] Auerbach Mot. 5:14-16.
    [44] Auerbach Mot. 6:17-7:3.
27
                                                    - 20 -

1   nature of the payments.[45]

2   According to Auerbach's summary judgment evidence, the Consulting Payments were

3   paid by CCDH to Auerbach for services performed by Auerbach for the benefit of CCDH prior to

4   the hospital's accreditation and opening. Auerbach testified by deposition that she started

5   working as a consultant for CCDH in February 2004 after being approached by a project manager,

6   Jensen Partners, to do an assessment of the hospital for accreditation by the Joint Commission on

7   Accreditation of Hospitals.[46]  She testified that she "was retained by CCDH to create a hospital."[47]

8   Auerbach testified that Mark Bidner, President of Salas, CCDH's General Managing Partner,

9   offered her the position of President of CCDH.[48]  She "began serving as president of the hospital

10  as of [the] consulting agreement,"[49] and that payment for her services to CCDH were made

11  pursuant to the Consulting Agreement because "this was prior to the point where there was a

12  payroll for the hospital."[50]  It was her understanding that she would be paid by CCDH,[51] and she

13  was, in fact, paid by CCDH.[52]  Auerbach testified that at the time she was providing consulting

14  services, she reported to the CEO of the hospital, Joel Bergenfeld,[53] and worked with him daily

15  "[s]etting up all programs, services, systems, processes, policies, procedures, purchases,

16  everything there was to do to create a hospital," except the financial operations of CCDH.[54]  She

17  further testified that each of the Consulting Payments were in lieu of salary and prior to being

18  placed on the payroll as President of CCDH.[55]

19

20  [45] Id. 7:3-7.

21  [46] Auerbach Depo. 15:20-16:15.
    [47] Id. 28:23.

22  [48] Id. 30:20-25.

23  [49] Id. 29:1-2.
    [50] Id. 28:24-25.

24  [51] Id. 31:8-9.

25  [52] See supra notes 5, 6 & 7.
    [53] Auerbach Depo. 32:9-14.

26  [54] Id. 34:21-35:13.
    [55] Id. 47:5-7; 48:5-6; 48:20-21.

27

1        Auerbach's summary judgment evidence also supports a finding that the Relocation Loan

2    was integral to a compensation package negotiated by Auerbach to accept the position of

3    President of CCDH.  Auerbach testified that:

4        I insisted that the terms of my employment for the Hospital include a relocation benefit
         because uprooting myself and agreeing to devote three years of my life to a startup hospital
5        entailed a significant sacrifice on my part.  I knew that the job of president would be a 24/7
         type of job.
6
         Relocation benefits are very common in my industry for the type of position as president
7        that I was accepting.  The amount I received was reasonable and in line with industry
         standards.  Having been in the healthcare industry for over 25 years at that point, I was
8        well aware of market and industry standards for the position of President of CCDH.  I was
         directly employed, paid by and received benefits as an employee of CCDH.
9
         My negotiations with CCDH over my salary and benefits involved educated people on
10       CCDH's side.  We were both reasonably motivated to reach an agreement, but neither I
         nor CCDH was under any undue pressure to reach an agreement.[56]
11
     Auerbach further testified:
12
         My relocation loan was issued as a part of my agreement to work exclusively as CCDH's
13       president for three years.  Each year one third of the loan would be forgiven and it was
         taxed at the end of each year on the loan forgiveness.  Ultimately, I paid taxes to the IRS
14       and the Franchise Tax Board on the entire $180,000.00.

15       The $180,000.00 check was signed by Randy Rosen, CEO of CCDH's managing general
         partner and CCDH board member.  This check, like the three $22,917.00 checks
16       mentioned above was also given to me by CCDH pursuant to Mark Bidner's authorization.

17       I lived in Palos Verdes.  Because of traffic conditions, the commute to Century City was in
         excess of 1 hour 45 minutes each way.  It was worse preceding weekends and holidays.
18       Given the already long hours (10-12 hours a day) adding three and a half hours to the day's
         commute was impossible.  I moved to the West Side where my commute was reduced to
19       11 miles, taking only about 20 minutes, much more doable.  In addition, I had 24/7/365
         responsibility for the operations of the hospital and had to come in from time to time to
20       deal with serious issues that could not be resolved over the phone.  The long commute
         made it difficult to be responsive on a timely basis to critical issues that needed my prompt
21       or immediate attention.[57]

22       Having pointed out an absence of evidence to support one or more elements of the non-

23   moving party's case, the burden shifts to Diamond to produce significantly probative evidence of

24   specific facts showing there is a genuine issue of material fact requiring a trial.  <u>T.W. Elec. Serv.</u>

25   _____

26   [56] Auerbach Decl. ¶ 15.
     [57] <u>Id.</u> ¶ 35.
27

                                          - 22 -

1    v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Diamond has no direct

2    evidence that CCDH made the Subject Transfers to Auerbach with the actual intent to hinder,

3    delay or defraud a creditor. The evidence that Auerbach acted without fraudulent intent is

4    uncontradicted. Instead, Diamond points to the existence of several "badges of fraud" to support

5    his position that CCDH had such an intent at the time the payments were made to Auerbach, to

6    wit:

7        (1)    As the President of CCDH, Auerbach was an insider;

8        (2)    CCDH was being sued, and was threatened with suit by, among other creditors,
             Matt Construction . . . ;

9

    (3)    CCDH was unable to pay its debts as those debts came due;

10

    (4)    CCDH was insolvent in that its liabilities exceeded the value of its assets;

11

    (5)    The [Subject] Transfers to Auerbach occurred shortly before, while and/or shortly
12                 after CCDH incurred substantial debts;

13        (6)    CCDH did not receive "reasonably equivalent" value in exchange for the Transfers
             sought to be avoided; and

14

    (7)    Auerbach did not take the money from CCDH in "good faith."[58]
15

The nub of Diamond's argument is that Auerbach was paid in full for her services and that he is
16
"seeking to recover only moneys which Auerbach took from CCDH and which Auerbach had
17
agreed in writing would be paid to her by the then sole general partner of CCDH, [Salas], and not
18
paid by CCDH."[59]  Diamond asserts that "[t]he [Subject] Transfers are comprised of a
19
[Relocation] Loan, which [Auerbach] could not have given reasonably equivalent value through
20
personal services, because she signed a promissory note for it. Further, the Consultant Payments
21
were also to be paid by Salas to [Auerbach], as [Auerbach] had agreed, and yet she took them . . .
22
from CCDH anyway."[60]  Diamond reasons that "[CCDH] received no consideration whatsoever
23

24

_____

25    [58] Diamond Opp'n 3:12-4:8 (footnotes omitted).

26    [59] Id. 4:n. 10.

    [60] Id. 21:3-6.
27

1  for the [Subject] Transfers received by [Auerbach],[61] and "[a]s a matter of law, Auerbach should

2  not be allowed to now assert that her personal services constituted 'reasonably equivalent value'

3  given to CCDH, when CCDH was not obligated to transfer the moneys in question."[62] Finally,

4  Diamond asserts that the court, in making a determination whether there is a genuine issue of

5  material fact requiring a trial on the issue of reasonably equivalent value, must not inquire beyond

6  paragraph 3 of the Consulting Agreement and paragraph 2.4.6 of the Executive Employment

7  Agreement.

8      "[T]he presence of one or more [badges of fraud] does not create a presumption of fraud,

9  but 'is merely evidence from which an inference of fraudulent intent may be drawn.'" Wyzard v.

10  Goller, 23 Cal.App.4th 1183, 1190 (1994) (citation omitted). Few of § 3439.04(b)'s 11 non-

11  exclusive factors arguably apply to the facts of this case. It is undisputed that the Subject

12  Transfers were to Auerbach, as President of CCDH, an insider. Diamond has presented evidence

13  that, at the time of the Subject Transfers, CCDH was insolvent[63] and that a dispute had arisen

14  between CCDH and Matt Construction Corporation ("Matt") regarding the balance due by CCDH

15  to Matt for labor performed and materials furnished to CCDH after March 31, 2005.[64] However,

16  _____

17  [61] Id. 21:12-13.

    [62] Id. 4:n.10.

18  [63] See Declaration of Daniel L. McConaughy 8:11-13.

19  [64] See Plaintiff's 1st Set of Request for Judicial Notice in Support of Plaintiff's Opposition to
    Defendant's Notice of Motion and Motion for Summary Judgment [Set One] Ex. 7 (Amended

20  Proof of Claim # 89-2 filed by Matt in the amount of $5,984,099.89 on October 6, 2009, based
    on a Judgment entered in Case No. BC 337759, KDC, Inc. v. Matt Construction Corp., et al., in

21  the Superior Court of California, County of Los Angeles, on March 30, 2009, confirming an
    arbitration award for work performed and material furnished by Matt to CCDH after March 31,

22  2005). According to the Decision and Interim Award of Panel attached to Matt's Amended

23  Proof of Claim:

24      Matt initiated [the] arbitration to recover $4,600,883.89 from CCDH. This figure is
        simply the sum of the last four invoices submitted by Matt to CCDH for its work on the

25      Project after March 31, 2005, plus an unpaid balance for previous work. No part of these
        invoices was paid by CCDH. All ten previous invoices were paid, less retention, except

26      that there was no retention on "general condition" costs. The essence of Matt's case is

27
                                    - 24 -

1   Diamond's summary judgment evidence does not establish that CCDH was being sued or

2   threatened with suit by Matt or any other creditor prior to the Subject Transfers. Nor is there

3   credible evidence that Auerbach, in her capacity as President of CCDH, knew that one or more

4   creditors were not being paid at the time she received the Subject Transfers. In response to this

5   inquiry at her deposition, Auerbach testified that (1) she did not set up the financial operations of

6   the hospital;[65] (2) CCDH always paid its debts during the time she was there;[66] (3) she was not

7   involved in funding, reviewing applications for funding, negotiating for funding or discussing

8   funding with the CFO, Frank Arambula;[67] (4) it was never brought to her attention by the

9   accounting department that the hospital may have been in financial trouble or not paying its bills

10  as they came due;[68] (5) she did not have a role in the financial operations of the hospital as

11  President of CCDH;[69] and (6) she did not have regular meetings with the chief financial officer.[70]

12  None of this raises a triable issue of fact.

13          Nor is there evidence of any other "badge of fraud." CCDH did not retain possession or

14  control of the property after the Subject Transfers nor did CCDH abscond, remove or conceal

15  assets. The Subject Transfers were disclosed, not concealed, and the Subject Transfers did not

16  constitute substantially all of the assets of CCDH.

17          Auerbach was qualified to serve as President of CCDH. She has a Master's Degree in

18  Hospital Administration from Post College, Long Island University in New York, and is Board

19

20  ───────────────

            the proposition that the parties settled substantially all outstanding unpaid sums and
21          disputes between them as of March 31, 2005, as a result of the signing on May 18, 2005,
            of Change Order No. 3 ("OCO No. 3" or "OCO 3").
22

23  Id. Ex. 7, 473.
    [65] Auerbach Depo. 35:12-13.
24  [66] Id. 40:16-17.
    [67] Id. 41:10-21.
25  [68] Id. 42:3-7.
    [69] Id. 54:18-21.
26  [70] Id. 57:10-12.

27
                                              - 25 -

1  Certified in Health Care Administration and a Fellow of the American College of Healthcare

2  Executives.[71]  She has more than 30 years experience in healthcare executive management,

3  including over 14 years as a hospital CEO.[72]  She is a recipient of numerous honors and

4  recognitions.[73]  She rendered services directly to CCDH, not Salus, and her services resulted in a

5  direct benefit to CCDH.  Due to Auerbach's efforts pursuant to the Consulting Agreement, CCDH

6  received accreditation from the Joint Commission for Accreditation of Hospitals, opened its

7  emergency room to patients, and began accepting MediCare on November 18, 2005.[74]  Indeed,

8  CCDH's satisfaction with Auerbach's work as president of the hospital resulted in a bonus at the

9  end of 2005 in the amount of $102,000.[75]

10      Auerbach's compensation package as President of CCDH consisted of salary, annual

11  bonus, insurance, 401K contributions and other benefits, and the Relocation Loan.  The

12  Relocation Loan was made in conjunction with Auerbach's employment as President of CCDH as

13  an inducement for her to accept the position for a three-year term.  Auerbach negotiated the terms

14  of her compensation package.  There is no evidence that Auerbach's compensation package was

15  not negotiated in good faith, or that the Relocation Loan was not reasonable under the

16  circumstances nor in line with industry standards.  There is no evidence that Auerbach did not

17  intend to repay the Relocation Loan on the terms agreed to by the parties at the time the

18  promissory note evidencing the loan was signed and the transfer was made.  Nor is there any

19  evidence that CCDH did not intend the Relocation Loan to be paid absent grounds to forgive the

20  debt.  When Auerbach was terminated without cause, the Relocation Loan was forgiven in

21  accordance with Exhibit D of the Executive Employment Agreement and Auerbach reported the

22  debt forgiveness as income for tax purposes.

23  _____

24  [71] Auerbach Decl. ¶¶ 3-4.
25  [72] Id. ¶ 1.
    [73] Id. ¶ 5.
26  [74] Id. ¶ 42.
    [75] Id. ¶ 23.
27

1    Auerbach's summary judgment evidence establishes that each of the Consultant Payments

2  and the Relocation Loan were made by CCDH, as her joint employer, as an integral part of

3  Auerbach's compensation package, that Auerbach's compensation arrangement was negotiated at

4  arms length, and that she received the payments in good faith and for a reasonably equivalent

5  value. Diamond has not come forward with significantly probative evidence establishing a

6  genuine issue of material fact for trial.

7                              III.  CONCLUSION

8    For the reasons stated, Auerbach is entitled to a summary judgment against Diamond on

9  the First, Second, Third, Fourth and Fifth Claims for Relief set forth in Diamond's First Amended

10  Complaint. A separate order and judgment will be entered consistent with this opinion.

11  Dated: November 2, 2011

12

13                                      PETER H. CARROLL
                                        Chief Bankruptcy Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27
                                    - 27 -

| In re: | | CHAPTER: |
|---|---|---|
| | Debtor(s). | CASE NUMBER: |

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify* ___**MEMORANDUM DECISION**___ was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of_11-2-2011_, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- John A Graham    jag@jmbm.com
- Matthew F Kennedy    mkennedy@dgdk.com
- Howard Kollitz    hkollitz@dgdk.com
- Walter K Oetzell    woetzell@dgdk.com
- Steven J Schwartz    sschwartz@dgdk.com
- Zev Shechtman    zshechtman@dgdk.com, danninggill@gmail.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

☐ Service information continued on attached page

**III. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

☐ Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                      **F 9021-1.1**